**KENTUCKY BAR ASSOCIATION,**
**Movant,**

v.

**Ronald HINES, Respondent.**

**No. 2012–SC–000842–KB.**

Supreme Court of Kentucky.

June 20, 2013.

## OPINION AND ORDER

This opinion and order resolves four disciplinary files, KBA File Nos. 8969, 12704, 15869, and 17216, against the Respondent, Ronald E. Hines. All told, Hines has been charged with 22 counts of violating the Rules of Professional Conduct. The Board of Governors of the Kentucky Bar Association has recommended that Hines be found guilty of five counts (with several of the other counts merged into these), and not guilty of the other counts, and be suspend-ed for 120 days for the conduct in KBA File Nos. 8969 and 12704. The Board has recommended that he be found guilty of two counts and not guilty of two counts and publicly reprimanded for the conduct in KBA File 15869. Finally, the Board has recommended that Hines be found not guilty of the three counts in File 17216. Hines has sought review of the recommen-dation by this Court under SCR 3.370(7). Though it did not seek review, the Office of Bar Counsel has asked in its brief that Hines be found guilty of all counts and be suspended for at least two years.

This Court, having reviewed the record and the briefs, concludes that except as to one count, the trial commissioner and Board of Governors were correct. This Court also concludes that the suspension recommended by the Board is appropriate.

### I. Background

Hines was admitted to practice law in 1987. His KBA Member Number is 82501, and his bar roster address is 201 N. Main Street, Elizabethtown, Kentucky 42701. These disciplinary proceedings stem from three different cases, each of which is discussed below.

### A. KBA Files 8969 and 12704

These charges stem from Hines's representation of a corporation that was formed to manage property from the estate of Elihu and Diana Cody, who owned approx-imately 500 acres of land in Perry County when they died in the early twentieth cen-tury. The land is rich in timber, oil, coal, and gas. By the 1990s, the Codys had approximately 100 heirs claiming an own-ership interest in the property. The heirs believed that timber and coal were being wrongfully extracted from the land by var-ious companies.

In 1991, on advice of Hines, the heirs formed the corporation in question, Cody

Properties, Inc., to take title to the property and to facilitate the sale or lease of the timber, coal, oil, and gas. The heirs used the services of another lawyer to create the corporation, which had an eight-member board of directors.[1]

In 1993, the heirs contacted Hines again. At that time, Hines was hired by the corporation to represent it "in connection with any and all actions, claims, sales, leases, purchases whatsoever situated regarding a tract of land known as the Elihu Cody tract ... [and] in all aspect of ownership of said tract including but not limited to obtaining buyers for oil, gas and mineral rights and purchasers for all timber."[2] As compensation, Hines was to get 20% of the net amount recovered on any claims, including mineral leases and timber sales. If he was discharged within 30 days prior to any written offers for purchase or lease, he was to be paid at the rate of $100 per hour for time already spent on the representation. The employment agreement was signed by Marie Spencer as president of Cody Properties, Inc.

Hines then represented the corporation in litigation to recover the proceeds of timber wrongfully harvested and coal wrongfully mined from the land. He obtained at least one settlement for illegally

taken timber. He also began litigating a claim against LeeMike Coal Company.

In March 1998, he negotiated a coal lease with Leeco, Inc. The lease provided that 18% of the royalties were to be paid directly to Hines, 2% were to be paid to coal brokers who assisted in the negotiations, and the remainder, 80%, to be paid to the corporation. In essence, the lease reflected Hines's 20% contingency, with the brokers' fee reducing his overall fee to only 18% of the proceeds of the lease. However, no coal was ever mined under this lease.

In the late 1990s, a division arose between two factions of the heirs. The trial commissioner suggested that the division stemmed from a dispute over whether Marie Spencer was qualified to serve as an officer of the corporation. Hines has suggested and the trial commissioner found that the corporation's governing documents required that any officer or board member must be a descendant of the Codys, though no explicit limit appears in the articles of incorporation and there may not have been bylaws with such a requirement in operation until 2002. There was some dispute over whether Spencer was actually a Cody descendant.[3]

---

1. Each member of the board was from a branch of the family, with each branch being the descendants of one of Elihu and Diana Cody's eight children who in turn had children. (Their ninth child died without issue.) There is some dispute in the record over whether each branch was legally entitled to have a board member or whether that was simply the practice. The articles of incorporation do not include such a limitation, and instead simply state who the starting officers and directors are and that the directors are to be "of such number as the shareholders may select at each annual meeting of the shareholders." The trial commissioner found that other documents, likely the corporate bylaws, created this requirement, but the copy of the bylaws with this requirement in the record is

from 2002, and there is some evidence that no bylaws were in place until then.

2. Another lawyer was hired at the same time. He, however, appears not to have done any work for the corporation and eventually withdrew.

3. Apparently, Spencer had been told she was adopted by one of the heirs, which gave rise to the concern that she was not technically an heir as required by the corporate documents. However, according to an affidavit of her mother, Spencer was actually the biological child of the heir, and the claimed adoption had been a ruse perpetuated "[o]ut of respect and consideration for the feelings and reputation of Marie Spencer."

Some documents in the record suggest that the division was actually over whether to keep Hines as counsel for the corporation. Apparently, a majority of the board members was dissatisfied with the work Hines had done in marketing the assets of the corporation. The board members were also concerned about the effect of double taxation on corporate profits.

Regardless of the cause, a division of the heirs—the corporation's shareholders—into two factions emerged. One of the factions was led by Spencer. Hines sided with the other, which was made up in part of heirs with whom he had worked closely, namely, Thermal Cody and David Combs and their families, and possibly Maga Lea Wiseman.

Regardless of its source, the division was very real. And over time, it deepened, or, as the trial commissioner noted, it "festered and grew." Spencer's faction decided to terminate Hines's employment contract. They also wanted to reorganize the corporation to minimize the effects of double taxation on the corporation's profits.

At a board meeting on October 23, 1999, Dennis O'Brien, a CPA, and Carlton Neat, another attorney, were introduced to the board. They explained their recommendation of forming a limited liability company to succeed the corporation and take over ownership of the Perry County property to reduce double taxation.[4] The board voted unanimously to hire the men for this project.[5] Present at this meeting were all of the officers—Marie Spencer, president; David Combs, vice president; Maga Lea Wiseman, treasurer; and Rachel Holcomb, secretary. Additionally, present and voting were seven of the eight directors—Ruby Wells, Thermal Cody, Maga Wiseman, Mavie Lewis, Ruth Cody, Thomas Cody, and Vanda French.[6]

Apparently, Spencer had been intending to propose the conversion plan for some time.[7] On October 5, 1999, before the board meeting, she had sent Hines a letter terminating his services in "marketing the assets of the corporation." The letter, however, asked Hines to continue working on the litigation with LeeMike Coal Company over coal that had been wrongfully mined from the property. The letter also informed Hines that the corporation was seeking to restructure to avoid double taxation and to transfer its assets, and therefore no further deals should be made on behalf of the corporation.

In December 1999, Spencer organized Cody Heirs Properties, LLC.[8] The corporation was not dissolved and continued to exist.

4. O'Brien's hiring was precipitated to some extent by Hines, who when asked about the tax effects of the corporate structure had stated he had little experience in that area and had recommended the board hire a CPA.

5. Since the vote was unanimous, and the actions covered by the vote are what eventually led to the open dispute in this case, it is not clear exactly when the "festering," underlying dispute began.

6. Though it is not entirely clear, it appears that the board member not present was James Couch.

7. In fact, in a letter to Hines dated October 10, 2000, O'Brien stated: "I recall you stating ... that Marie Spencer had instructed you several months ago to stop all efforts for new lease contracts, etc. Marie may have been hoping to employ me in that capacity when she contacted you."

8. Cody Heirs Properties, LLC was administratively dissolved in November 2001. When the plan to restructure was eventually carried out, it was through a second entity, Cody Heirs, LLC, which was formed in February 2001.

In September 2000, a meeting of the corporation's shareholders was held at which the factional division finally became apparent. At this meeting, both directors and officers were elected directly by the shareholders.[9] This departed from the past practice whereby shareholders elected the directors, who in turn elected the officers. No advance notice of this change was given. Most of the officers (Marie Spencer, Maga Wiseman, and Rachel Holcomb) were present; the vice president, David Combs, was not present. Six of the board members—Ruby Wells, Thermal Cody, Maga Wiseman, Thomas Cody, Ruth Cody, and Vanda French—were present. Two board members, James Crouch and Mavie Lewis, were not present, though Couch sent a proxy to vote in his stead.

Of the board members then serving, all were reelected to their positions except Thomas Cody, who was replaced by James E. Cody. All the officers were reelected, except David Cody, who was nominated for president and lost, and then was nominated for vice president and lost. He was replaced as vice president by James Hoskins. Thus, there were only two changes to the makeup of the board and officers.

Hines was present at the meeting. He voiced concern that the election of the board and officers was invalid because of the lack of notice, which he claimed was required under the corporate bylaws.[10] He left before the end of the meeting, possibly along with two members of the board, Thermal Cody and Maga Wisemen, who are shown as "not present" on a vote at the end of the meeting.

After Hines left, the board of directors voted to hire O'Brien as the general manager of both the corporation and the LLC.[11] He was to replace Hines as the marketer of the timber and mineral rights. The board also voted to authorize the transfer of the corporation's assets to the LLC and to execute a promissory note in return.[12]

The transfer of assets to the LLC was not carried out at that time, however, at least in part because the dispute carried over into a flurry of letters between Hines and Spencer and O'Brien. It is these letters that give rise to much of the alleged misconduct in this case.

The first letter was sent by O'Brien to Hines in October 2000, very soon after the meeting. In it, he explained he had been hired by the corporation's board as general manager and had been assigned the responsibility to market the mineral and timber assets, negotiate leases, etc. going forward. He also noted that Spencer had terminated Hines's employment with respect to those activities several months before. He also asked Hines to keep him apprised of the LeeMike litigation.

Hines responded with a letter of his own later in the month. He claimed the board-of-directors and officers elections "were not legal," and claimed a right to "20% of all [of the corporation's] income, regardless of origin of revenue." Hines also

9. The corporation and LLC's meetings were held simultaneously.

10. Again, it is not clear from the record if official bylaws were in place at this time.

11. Based on a close reading of the minutes of this meeting, it appears that Thermal Cody and Maga Wiseman had definitely left the meeting at this point, as they are listed as "not present" in the voting on the hiring of O'Brien.

12. It is not clear, based on the minutes of this meeting, whether Thermal Cody and Maga Wiseman were present for this vote, which actually occurred before the O'Brien vote. They are not listed as signing or voting in favor of the resolution, nor are they shown as "not present."

stated that the letter constituted a lien against 20% of all corporate income, and asked that O'Brien inform him "of every deal, contract or other source of income that comes to the Codys by anyway other than [him]." O'Brien forwarded a copy of this letter to Spencer.

In December 2000, Spencer sent a letter responding to Hines and informing him that O'Brien had been hired to replace him in marketing the assets of the corporation. It also explained that Hines's employment agreement had been with the corporation but that all future marketing of the assets would be through the LLC, with which Hines had no employment agreement. Spencer also asked Hines to explain why he believed the September board elections had been illegal. The letter also reiterated that Hines's marketing services had been terminated.

In January 2001, Spencer filed a bar complaint against Hines for continuing to act as though he were counsel for the corporation in matters other than in the LeeMike litigation. The bar complaint gave rise to KBA File No. 8969.

In February 2001, the board of the corporation met and again authorized Spencer to sell the assets of the corporation to the LLC as part of the restructuring.[13] The LLC was to be owned by the various heirs just as the corporation was, and was to be managed by an eight-member set of managing members. Initially, the managing members of the LLC were the same as the board of directors of the corporation. (This does not appear to have changed in subsequent elections.) As managers of the LLC also, the board members approved an operating agreement for the LLC. As consideration for the transfer of the property, a promissory note was created by which the LLC would owe the corporation

$150,000 plus 8% interest per year. The transfer and promissory note were completed later that month.

Also in February, O'Brien sent Hines a letter about the Leeco, Inc. lease. He expressed some concern over the terms of the lease, stating that the terms differed from what had been described to him by some of the heirs, and that the terms differed from what had been voted on by the board in 1998. (The vote had allegedly been for a three-year performance term and a "10 year out," meaning mining had to stop within 10 years; the actual lease provided a year-to-year lease automatically renewable if Leeco made certain payments, and only required that Leeco begin mining within 10 years.) O'Brien asked that Hines contact him to explain what had happened. Five of the eight directors of the corporation signed off on this letter, as did Spencer. Hines did not respond specifically to the requests in this letter.

After the initial letter partly terminating his employment, Hines continued his efforts in the LeeMike litigation, at least until March 2001. As part of this work, Hines sent two letters to Spencer in 1999 requesting core drilling results from Leeco, Inc. (the entity with which he had negotiated coal leases) for use in the LeeMike litigation. Spencer never provided these results.

In March 2001, Hines sent a letter to Spencer again alleging that the corporation was "being operated illegally" and was "subject to a hostile takeover." He again alleged that the September 2000 elections had been illegal, which he claimed made any decisions by the board void. He described the attempt to "convert" the corporation to an LLC as "merely a ruse for a hostile corporate takeover by outsiders," which he "d[id] not want to be part of."

13. This was the second incarnation of the company, Cody Heirs, LLC.

In the same letter, Hines stated that he had been contacted by O'Brien, presumably referring to the February 2001 letter, but that because O'Brien "ha[d] not been hired by a legal board," he "felt it was not in the best interest of [his] clients, the Cody Heirs, to discuss much business in detail with [him]." He also alleged that the LLC was not a proper entity, having been created with fraudulent papers that he considered "void on their face." [14] The letter included additional allegations that "outsiders are getting ready to takeover [sic] not only the Corporation but also use the land, the timber and all the minerals ... for their own use and thereby be[ ] able to steal all those assets away from the Cody Heirs."

Hines stated that he did not want to be part of this takeover, and thus offered to resign as counsel for the corporation under a set of conditions. Specifically, as to the LeeMike litigation, he offered to take a fee of $22,850 to cover hourly rates and expenses. This, he claimed, was substantially less than the approximately $200,000 fee he would get from taking his 20% contingency on the likely final outcome in the case. Hines concluded the letter by stating that he did not want to withdraw, but that he would do so because he "d[id] not want to be part of the unlawful takeover and the inevitable theft of the Cody Heirs' land and minerals."

On April 6, 2001, he sent another letter to Spencer. In this letter, he again accused the corporate board of acting improperly, claimed that there was no valid LLC, and accused O'Brien of practicing law without a license. He also accused Spencer of having libeled him in a March 2001 letter to David Combs, and claimed that she "can be sure that the statements will not go unaccountable." He also accused Spencer of abandoning her loyalty to the "Cody Heirs" and conspiring with outsiders to defraud the heirs of their land and mineral rights. He closed the letter by demanding payment of his bill, which was enclosed with the letter, and threatening to reschedule depositions, putting them off until his bill was brought up to date. The new bill included with the letter was titled "Billing Statement for Cody Heirs," and it listed 107 charges for services between February 1997 to April 2001, totaling $23,500.

On April 10, he sent Spencer an updated bill adding a charge for miscellaneous phone calls over the previous four years, and a set of phone calls in April 2001. The new bill totaled $25,407. Included with this bill was another letter asking that a check in the Leeco matter be sent to the "treasurer," [15] and stating that her "failure to do so may be construed as further embezzlement."

On April 26, Spencer sent Hines a letter responding to the March 2001 letter. In it, she again asked Hines to state in detail how he thought the corporation was being operated illegally. She also asked how the corporation was subject to a hostile takeover. She also asked, again, how the vote at the September 2000 meeting had been illegal, and noted that he had not yet responded to her previous request for information on this subject. The letter included several other requests that Hines explain in detail his allegations about the potential theft of assets. The letter also

14. In this letter, it is evident that Hines was relying on information from and relaying concerns of two heirs in particular, David and Thermal Cody, who were reluctant to cooperate in ongoing litigation. Thermal Cody was on the board of the corporation. He had not joined the resolution to convert the corporation to an LLC, nor did he sign off on the February 2001 letter to Hines.

15. It is not clear to whom this refers.

referred to a telephone call with Hines in which he had mentioned that "someone may get shot over this"; Spencer asked whether this was an attempt to intimidate her.[16] The letter also noted that Hines appeared to be communicating with individual heirs but that he had been hired by the corporation. The letter then asked Hines whether he had been hired by individual heirs and thus had a conflict of interest.

On May 17 and July 9, Spencer wrote Hines stating that she was still awaiting a response to her April letter, a copy of which was enclosed. The members of the board were sent copies of this letter.

In June 2001, the board met and authorized O'Brien to find an attorney to replace Hines in the LeeMike litigation and to negotiate with Hines to terminate his employment contract.

On July 26, Spencer sent a letter to Hines stating that his services had been completely terminated, whereas they had previously been only partially terminated. She specifically noted that his services with respect to the LeeMike litigation were terminated, and asked that Hines prepare such court documents as would be necessary for him to withdraw as counsel of record.

Hines replied to this letter with one of his own in which he claimed that his termination was illegal because the board had not voted on the matter. He also stated that he had been advised by some of the heirs that Spencer was "not a Cody Heir." He wrote that he had been told "[t]hat [Spencer] was never a daughter of Elihue Cody nor w[as] [she] ever adopted by any Cody male." He also wrote: "There have been further allegations made that you have fraudulently concealed the fact that

you are not a Cody Heir and have attempted to perpetuate this fraud on all the other Heirs." He advised Spencer to contact him "to remedy this problem and prevent further catastrophic legal action," if she was in fact not an heir. He concluded by stating that he would be glad to tender his resignation if the entire board voted to discharge him.

In September 2001, Thermal Cody, a member of the minority faction, filed a criminal complaint against Spencer in Perry County alleging theft by unlawful taking for allegedly embezzling money from the corporation. This charge was eventually dismissed on jurisdictional grounds.

Hines continued to hold himself out as counsel for the corporation. For example, in October 2001, he wrote a letter to Leeco, Inc. stating: "I am still the only viable, legally recognized non-Cody person to represent the interest of Cody Properties, Inc. and the person of direct contact for this matter and for this [coal lease] matter."

At a December 2001 informal meeting of the heirs, Hines was present and made the following statement:

> Marie ... filed a bar complaint against me with the bar association claiming that I have somehow misled the corporation; okay? Now, her hope is this is the only chance they know now that they could possibly get me away from this, if by some chance they would win this complaint and the bar association will suspend me from the practice of law saying that I did something wrong. But they got an uphill battle there, okay? But even if they were to win and even if I'm out of the picture, and that's the reason I'm here today is to tell you that if I'm gone from this picture, you've got

16. The minutes of a meeting of the board in September 2001 mentioned that this call had

been recorded and a transcript of its contents had been handed out to the board members.

to do something. Stick to your guns and don't sign these LLC papers, because what the LLC papers have done … they have basically taken the power of attorney from anybody who signs that, which means if you sign that paper, you have no more voice. They make a decision for you without consulting you. Plus, it takes our corporation, Cody Properties, Inc. and obligates Cody Properties, Inc. to owe that corporation $150,000.... They're gonna call the note due and O'Brien and his lawyers now own your property. And they own your coal and your oil and your gas, okay? And that is the ultimate plan.

In January 2002, Linda Hayse, another member of the minority faction, filed a criminal complaint against O'Brien for assault that allegedly occurred at a board meeting in the lobby of a hotel in Hazard. O'Brien was placed on pretrial diversion, and the charge was eventually dismissed.

That same month, several members of the minority faction filed a complaint against O'Brien with the Kentucky Board of Accountancy. This complaint was dismissed for lack of probable cause.

Also in January 2002, Hines filed a petition for declaration of rights on behalf of the corporation in Perry Circuit Court seeking a declaration that Spencer's faction had unlawfully managed the affairs of the corporation, asking for damages, and seeking an injunction against the board. The complaint named as defendants Spencer, O'Brien, three board members,

and Carlton Neat's law firm, and alleged, among other things, that the defendants were attempting to convert property, money, and mineral rights properly belonging to the corporation. The complaint was verified by David Combs, who signed as "vice-president,"[17] and Maga Lea Wiseman, who signed as treasurer of the corporation. Other shareholders filed affidavits in support of the suit. The complaint makes multiple references to the "legitimate members of the board of directors," who had allegedly asked the officers to quit acting illegally and who had allegedly been threatened by the defendants. Nevertheless, there is no question that Hines had no actual corporate authority to file the suit, and he later admitted this fact.

Indeed, a motion to dismiss soon followed alleging that the board had never authorized the suit. Affidavits of five board members and Spencer reflecting that Hines had not been authorized to file the suit were attached to the motion.

In August 2003, Hines arranged for another attorney, Bruce Atherton, to take over this case, and the action was eventually converted to a shareholder derivative suit on behalf of the minority shareholders (i.e., the non-Spencer faction of heirs). Hines turned over all his files to Atherton, the new attorney, not the corporation. Atherton's representation was of the minority shareholders on behalf of the corporation, and not directly of the corporation. This litigation was eventually resolved by an agreed order in 2004.[18]

---

17. This happened despite David Combs's losing his spot at the disputed September 2000 election.

18. Though it is not directly the subject of this matter, documents in the records show a second lawsuit, filed in Jefferson County in 2002, by O'Brien against Hines and several heirs in the opposing faction, alleging various causes of action related to the criminal complaint

that had been filed against him and the complaint to the state board of accountancy. Not only was he a defendant, Hines actually represented all the defendants in the case, and eventually filed a counter-claim on their behalf. This lawsuit explains the delay in the proceedings on the bar complaints, the first of which was filed in 2001, as the Inquiry Commission ordered them held in abeyance until the civil suit was finished. Though the record

In September 2003, at a special meeting, the board passed a resolution directing Spencer to again instruct Hines to cease any and all services for the corporation, and asking him to return any and all files. At a November 2003 meeting, a new board was elected; the new board reaffirmed the decision to terminate Hines's employment in all respects and asked that Hines return the client files.

Hines did not return the files to the board and instead gave them to Atherton, who at that time was litigating the shareholder-derivative action. The board never consented to Hines's turning the files over to Atherton.

In February 2005, Spencer filed a second bar complaint against Hines related to his failure to turn over the files. This complaint resulted in KBA File No. 12704.

The bar complaints filed by Spencer resulted in two formal charges by the Inquiry Commission. The first charge, KBA File 8969, had fourteen counts. The second charge, KBA File No. 12704, had only one count.

The first charge alleged the following violations by Hines:

1. Rule 1.4(a) [19] by failing to respond to letters from representatives of Cody Properties, namely, Spencer and O'Brien.

2. Rule 1.4(b) [20] by failing to explain to Spencer, or other duly elected representative of the corporation, his legal opinion on issues including but not limited to the legitimacy of the board, the lawfulness of elections, how the corporation was subject to a hostile takeover, and the nature of his employment contract.

3. Rule 1.5(a) [21] by receiving 18% of the heirs' gross royalties and fees collected through their contract with Leeco and when he asserted a right to 20% of the heirs' income, regardless of origin.

4. Rule 1.7(b) [22] by continuing to represent and advise the corporation after obtaining an interest in the heirs' assets, i.e., his 18% fee from the coal lease, adversely affecting the representation.

5. Rule 1.8(a) [23] by entering into a lease agreement with Leeco entitling him

---

does not indicate the outcome of the case, it appears to have concluded in the summer of 2008, and the disciplinary case was taken out of abeyance at that time.

19. The Rules of Professional Conduct are found in Supreme Court Rule 3.130. Rather than citing to the Rules of Professional Conduct as subsets of SCR 3.130—e.g., SCR 3.130–1.4(a)—we will instead simply refer to the Rules of Professional Conduct directly— e.g., Rule 1.4(a)—to save space and increase clarity. Additionally, the citations are to the rules in effect before the substantial amendments in 2009, as those were the rules in effect when Hines allegedly committed his misconduct.

Rule 1.4(a) stated: "A lawyer should keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information."

20. Rule 1.4(b) stated: "A lawyer should explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

21. Rule 1.5(a) stated: "A lawyer's fee shall be reasonable."

22. Rule 1.7(b) stated: "A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, by the lawyers' own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation."

23. Rule 1.8(a) stated: "A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possesso-

to 18% of the heirs' gross proceeds and royalties paid under the lease.

6. Rule 1.13(a)[24] by acting as described above, including refusing to reply to inquiries from the president and board members of the corporations, and filing a lawsuit on behalf of the corporation without the authorization of the board of directors.

7. Rule 1.13(d)[25] by getting involved with certain Cody Heirs, including Thermal Cody, David Combs and others, and promoting their interests within the corporation rather than communicating with and acting on behalf of the board of directors of the corporation.

8. Rule 1.16(a)(3)[26] by failing to withdraw from the representation of the corporation when he had been discharged.

9. Rule 1.16(d)[27] by failing to return the corporation's files upon termination of the representation.

10. Rule 3.1[28] by filing the lawsuit in Perry Circuit Court when the suit had not been authorized by the board of the corporation.

11. Rule 3.3(a)[29] by filing the lawsuit purportedly on behalf of the corporation when it had not in fact been authorized by the board.

12. Rule 3.4(f)[30] by participating in presenting or threatening to present criminal charges against Spencer and O'Brien, and by presenting or threatening to present a disciplinary complaint against O'Brien

ry, security, or other pecuniary interest adverse to a client unless: (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client; (2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and (3) the client consents in writing thereto . . . ."

**24.** Rule 1.13(a) stated: "A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents."

**25.** Rule 1.13(d) stated: "In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing."

**26.** Rule 1.16(a)(3) stated: "[A] lawyer . . . shall withdraw from the representation of a client if . . . [t]he lawyer is discharged."

**27.** Rule 1.16(d) stated: "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned."

**28.** Rule 3.1 stated: "A lawyer shall not knowingly bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established."

**29.** Rule 3.3(a) stated: "A lawyer shall not knowingly: (1) Make a false statement of material fact or law to a tribunal; (2) Fail to disclose a material fact to the tribunal when disclosure is necessary to avoid a fraud being perpetrated upon the tribunal; (3) Offer evidence that the lawyer knows to be false."

**30.** Rule 3.4(f) stated: "A lawyer shall not . . . [p]resent, participate in presenting, or threaten to present criminal or disciplinary charges solely to obtain an advantage in any civil or criminal matter."

with the state Board of Accountancy.

13. Rule 8.3(a) [31] by assisting or inducing others to file criminal and disciplinary charges for the sole purpose of obtaining an advantage in a civil matter, and by assisting or inducing others to make dishonest statements about the power-of-attorney forms and the new LLC, or when he committed these acts through another.

14. Rule 8.3(c) [32] by making dishonest statements to the Cody heirs, including that the creation of the LLC was a ruse to allow a hostile takeover by outsiders and strip the heirs of their ownership rights; that Spencer was an active conspirator to defraud the other heirs; and that the promissory note was a scheme to steal the corporate assets by outsiders.

The second charge alleged that Hines violated Rule 1.6(a) [33] when he revealed confidential client information by turning over the client files to Atherton.

After hearing the case, the trial commissioner entered a lengthy recommendation to resolve all the charges in these two KBA files.[34]

As to the first two counts, the commissioner recommended their merger and concluded that Hines was guilty of this misconduct—violating Rule 1.4(a)—because his client had been the corporation, not individual board members or shareholders, and that he had improperly failed to reply to Spencer and O'Brien's reasonable requests for information on multiple occasions.

As to Count 3, which related the reasonableness of Hines's fee, the commissioner concluded that while the billing practices had been sloppy and poorly explained, nothing suggested that he had billed the client for anything outside the scope of the employment contract. Though the commissioner did not specifically opine that Hines's fee, which had been slated to include 20% of the corporate revenues traceable to Hines, was reasonable, he concluded that Bar Counsel had not shown that Rule 1.5(a) had been violated.

As to Counts 4 and 5, which alleged that Hines continued to represent the corporation after taking an interest in the corporation adversely affecting his representation, and took an interest adverse to the client generally, the commissioner concluded that the 18% fee that Hines had been slated to receive was simply part of the contingent fee agreement in his employment contract, and was not an interest in the client's assets or adverse to the client. Thus, he concluded that Bar Counsel had not shown a violation of Rules 1.7(b) and 1.8(a).

As to Count 6, which alleged that Hines acted improperly in refusing to reply to inquiries from the corporation (acting through Spencer and O'Brien) and in filing

---

**31.** Rule 8.3(a) stated: "It is professional misconduct for a lawyer to ... [v]iolate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another...."

**32.** Rule 8.3(c) stated: "It is professional misconduct for a lawyer to ... [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation...."

**33.** Rule 1.6(a) stated: "A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation."

**34.** The recommendation also resolved two other KBA files, discussed below. Because those two files relate to different conduct, they are to some extent more naturally discussed separately.

the suit against the corporation, the commissioner concluded that Hines had violated Rule 1.13(a). He explained that the rule recognizes that when a corporation or other organization is the client, as opposed to individual constituencies of the organization, the lawyer owes the duties to the organization, and that while the lawyer is obliged at times to take certain reasonable measures in the interests of the organization, the steps he took (such as filing the suit) were not reasonable and did not avoid disrupting the organization, as required by the rule.[35] In essence, the commissioner found that Hines's behavior was like that of a lawyer representing some of the heirs, not the corporation, and that such representation would have been improper and conflict-ridden given his employment by the corporation.

As to Count 7, which alleged that Hines became involved with some of the Cody heirs and promoted their interests within the corporation instead of the interest of the corporation as a whole, the commissioner found that Hines had violated Rule 1.13(d). Specifically, the commissioner found that "Hines made a deliberate choice to side with the faction that opposed Marie Spencer," and that his "loyalty and efforts shifted from the corporate entity to the anti-Spencer faction of Cody heirs." Despite this shift, Hines did not explain to the corporation "the identity of his new, actual clients."

As to Count 8, which alleged that Hines improperly refused to withdraw from representing the corporation after being discharged, the commissioner concluded that Bar Counsel had failed to show a violation of Rule 1.16(a)(3). Specifically, he found that while Hines had been given written notice of his discharge as to all representation except the LeeMike litigation as of October 1999, he was not completely terminated, and that while Hines's behavior after that notice violated other ethical rules, it had a "sufficient nexus with the LeeMike litigation to come under the penumbra of what was left of Mr. Hines' 1993 employment contract."

As to Count 9 of File 8969 and the single count of File 12704, which alleged that Hines had failed to return the corporation's file upon the termination of the representation and had disclosed confidential information to Bruce Atherton, the com-

---

**35.** Specifically, Rule 1.13(b) recognizes that a lawyer should act in the best interests of the organization but should minimize disrupting it:

If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization. Such measures may include among others:
(1) Asking reconsideration of the matter;
(2) Advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and
(3) Referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.
Rule 1.13(b).

missioner concluded that Hines had violated Rules 1.16(d) and 1.6(a).[36] Specifically, he found that Hines had litigated the declaration of rights action in Perry Circuit Court on behalf of the dissident heirs, not the corporation, despite suing in the name of the corporation, that Hines had been terminated by the corporation in January 2002, and that he turned over the files to his successor in that litigation, who specifically represented the dissident heirs, and not to the corporation or its representative.

As to Count 10, which alleged that Hines had filed the lawsuit without the board's consent in violation of Rule 3.1, the commissioner concluded that the count should be merged into Count 7 and the violation alleged there.

As to Count 11, which alleged that Hines had purportedly acted on behalf of the corporation when he was in fact not, the commissioner concluded that the charge was duplicative of Count 6 and that it should also be merged with that count.

As to Counts 12 and 13, which alleged that Hines participated in or recommended the filing of criminal and disciplinary charges against Spencer and O'Brien, the commissioner concluded that Bar Counsel had not met its burden. Specifically, he found that the charges had been filed by various heirs, but he found that the proof did not support an inference that Hines was involved in these charges.

As to Count 14, which alleged that Hines made dishonest statements in various letters to Spencer and in person to some of the heirs, the commissioner concluded that Bar Counsel had not met its burden of proof. Specifically, he found that while the statements may have been ill-advised, technically incorrect, and reflective of a

misunderstanding of the law of corporate governance, they were "founded on his honest, but misguided, conviction that he was doing what was best for the people whom he mistakenly perceived to be his clients."

In summary, the commissioner found that Hines was guilty of the following in KBA File 8969:

(1) Count 1, Rule 1.4(a)

(2) Count 6, Rule 1.13(a)

(3) Count 7, Rule 1.13(d)

(4) Count 9, Rule 1.16(d)

The commissioner also found Hines guilty of the single count in KBA File 12704, Rule 1.6(a).

Based on these findings of misconduct, the commissioner recommended a 120–day suspension from the practice of law. In reaching this conclusion, he noted as aggravating factors, Hines's substantial experience in the practice of law, his previous misconduct (a violation of Rule 1.15(a) for failing to keep a client's property separate from his own and resulting in a public reprimand), a pattern of misconduct, multiple offenses, and a refusal to acknowledge the wrongful nature of his actions. In mitigation, the commissioner noted the remoteness of the prior discipline (occurring in 2003), the absence of a dishonest or selfish motive, and the lack of any proof of any specific pecuniary loss by a client or other person.

### B. KBA File 15869

The action related to Hines's representation of James Asher's minor child in a dog-bite case. Hines filed suit in Hardin Circuit Court against the owner of the dog and the property owner who rented to the dog's owner.

---

**36.** The finding includes a typo, stating that Hines was guilty of violating Rule "1.16(a)" in File 12704, but the commissioner's intent is clear.

The defendants did not file an answer to the complaint, but the dog owner delivered a letter to Hines contesting some of the facts alleged in the complaint, including the extent of the child's injuries. Hines sent a copy of this letter to his client but did not forward a copy to the court.

Despite having received this letter, Hines moved for a default judgment in the case on May 21, 2007. The rule governing such motions, Civil Rule 55.01, requires the motion to "be accompanied by a certificate of the attorney that no papers have been served on him by the party in default." CR 55.01. The motion did not include this language; instead, it stated that "no appropriate responsive pleadings have been filed on behalf of [the defendants]." This motion was granted on May 24, 2007, and a damages hearing was set for June 12.

The defendants appeared at the damages hearing. At that time, the trial court learned of the letter that had been delivered to Hines. Hines admitted to receiving the letter but stated he had not disclosed it because he did not consider it to be a sufficient answer. The court set aside the default judgment, stating that Hines "rewrote the rule by stating in his motion that 'no appropriate responsive pleadings have been filed,'" and that it was "for the Court to determine whether any document received by the Court or counsel is to be considered as an answer."

The client became frustrated with the representation. A letter included in the record on avowal, but deemed inadmissible by the trial commissioner, suggests that the client asked for his file back in October 2007. In February 2008, he sent a letter again asking that Hines return his file. Hines responded with a letter requesting payment of $150 for drafting the complaint and $148 for the filing fee and stating "this bill must be paid in full before I can release a copy of your file." On February 29, the client wrote Hines to terminate the representation; a copy of this letter was sent to the trial court. The court treated this as a motion for Hines to withdraw and required a hearing. After the hearing, on March 20, 2008, the trial court allowed Hines to withdraw as counsel. The same day, a copy of the client's file was returned to him.

Meanwhile, in October 2007, after demanding the return of his file, the client had filed a bar complaint against Hines. In May 2008, the Inquiry Commission issued a four-count charge alleging the following violations by Hines:

1. Rule 3.3(a)(2) [37] by failing to notify the trial court of receiving the letter from the defendants and proceeding to file the motion for default judgment as though the defendant had served no papers on him.

2. Rule 3.3(d) [38] by failing to advise the trial court in the motion for default judgment that he had received a letter from one of the defendants, where that information was necessary for the court to make an informed decision.

3. Rule 3.4(c) [39] by knowingly or intentionally disobeying his obligation under Civil Rule 55.01.

37. Rule 3.3(a)(2) stated: "A lawyer shall not knowingly ... fail to disclose a material fact to the tribunal when disclosure is necessary to avoid a fraud being perpetuated on the tribunal."

38. Rule 3.3(d) stated: "In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse."

39. Rule 3.4(c) stated: "A lawyer shall not ... [k]nowingly or intentionally disobey an obligation under the rules of a tribunal except for

4. Rule 1.16(d)[40] by failing to return the client's file when requested and by demanding that the client's bill be paid before releasing the file.

The trial commissioner concluded that Hines was not guilty of Counts 1 and 4. As to Count 1, he found that Hines had not made his filing with the intention of perpetuating a fraud and that no fraud actually occurred. Instead, the commissioner concluded, Hines had simply misunderstood what Civil Rule 55.01 had required. As to Count 4, he found that there was insufficient proof that the client terminated the representation before the February 29 letter and that Hines had turned over the file promptly after the representation ended.

The trial commissioner concluded that Hines was guilty of Counts 2 and 3. As to Count 2, he found that the default motion had been ex parte in nature and the defendants had not received notice, and that whether the defendant had responded to the complaint was a material issue for the court in deciding whether to grant default judgment. As to Count 3, he found that Hines had violated CR 55.01 not to perpetuate fraud but because he "fail[ed] to understand and follow the strictures of the rule." He noted that CR 55.01 is clear that the attorney must certify that he has received no "papers," which is a broader term than "pleading" or "sufficient answer." He also found that Hines, as a lawyer, is presumed to understand the requirements of the Civil Rules, and thus he knowingly disobeyed CR 55.01.

The trial commissioner considered as aggravating factors Hines's substantial ex-

perience, his prior public reprimand, and his refusal to acknowledge the wrongful nature of his conduct. In mitigation, the commissioner noted the remoteness of the prior discipline (occurring in 2003), the absence of a dishonest or selfish motive, and the lack of any proof of any specific pecuniary loss by a client or other person. For the misconduct in File 15869, the commissioner recommended a public reprimand.

## C. KBA File No. 17216

This charge arose from a Civil Rule 11 sanction against Hines and his client, Warren Pulliam, related to a series of banking lawsuits.

In 1988, Pulliam was president of People's State Bank in Chaplin, Kentucky. He had certified $835,000 in deposits that were not in fact present in the accounts. As a result of this mistake, Pulliam resigned from the bank and transferred his stock back to the bank. Barnett Bank, of Tampa, Florida, lost money as a result of the mis-certification of the funds and filed suit in Jefferson Circuit Court against People's State Bank. This suit was settled for $200,000, with Barnett Bank being paid by People's State Bank's insurance carrier, and dismissed by agreed order in 1989. The settlement was confidential at that time. Pulliam was not a party to this litigation. At the time, Hines did not represent Pulliam.

Between 1990 and 2005, Pulliam defended related litigation in Nelson Circuit Court and federal court. In those suits, he tried to prove that Barnett Bank had not suffered a loss. In the federal suit, the

an open refusal based on an assertion that no valid obligation exists...."

**40.** Rule 1.16(d) stated: "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned."

bank's insurer obtained a $200,000 judgment against Pulliam. As part of the Nelson Circuit Court case, the insurer sued Pulliam, several members of his family, and several entitles, and sought to undo various transactions and conveyances as fraudulent to allow it to enforce its judgment. Eventually, Pulliam filed his own suit in Nelson County alleging that the 1989 settlement had been the product of collusion and fraud. The Nelson Circuit Court eventually held that Pulliam could not collaterally attack the 1989 settlement in Nelson County and instead would have to proceed in Jefferson Circuit Court. Pulliam's lawyer in the Nelson County cases believed that it would be worthwhile to seek to reopen the Jefferson County case based on having obtained some of the settlement documents in discovery. Because that lawyer did not practice in Jefferson Circuit Court, he consulted with Hines, who did.

In February 2005, Hines moved to reopen the Jefferson Circuit case and allow Pulliam and the other clients to intervene as defendants under CR 24.01, despite the passage of 16 years since the settlement and dismissal of the case. He also filed a CR 60.02 motion to set aside the 1989 agreed order. After several months of litigation, including the filing of several related motions and memorandums, the motion to intervene was denied in March 2005.

Both banks that had been parties to the Jefferson Circuit litigation moved for Rule 11 sanctions against Hines and Pulliam. This motion was granted in December 2005. The Jefferson Circuit Court found that Hines and Pulliam violated Rule 11 and ordered sanctions in form of attorneys' fees of $27,777.48 against them. Hines appealed, and the Court of Appeals affirmed. This Court denied discretionary review, and the U.S. Supreme Court denied certiorari.

At some point a bar complaint was filed. The Inquiry Commission issued a three-count charge alleging that Hines violated Rule 3.1,[41] Rule 3.4(c),[42] and Rule 1.16(a)(1)[43] with his conduct in the Jefferson Circuit Court litigation that resulted in the Rule 11 order.

Before the trial commissioner, Bar Counsel argued that the Rule 11 order should have collateral estoppel effect to preclude Hines from re-litigating issues related to his conduct. The commissioner ruled that the order would conclusively establish that the Rule 11 violation occurred, but that Hines could introduce evidence of his motivation in the Jefferson Circuit Court proceeding.

After hearing the matter, the trial commissioner concluded that Bar Counsel had failed to show that Hines had violated the Rules of Professional Conduct in the Jefferson Circuit Court matter, despite the Rule 11 order. He found that Hines and his clients had a good faith belief, with some factual basis, that the 1989 settle-

---

**41.** Rule 3.1 stated: "A lawyer shall not knowingly bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established."

**42.** Rule 3.4(c) stated: "A lawyer shall not ... [k]nowingly or intentionally disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists...."

**43.** Rule 1.16(a)(1) stated: "[A] lawyer shall not represent a client ... if ... [t]he representation will result in violation of the Rules of Professional Conduct or other law...."

ment was indeed the product of fraud or collusion, and that efforts to assert claims or defenses based on this belief had proved futile in other litigation, leaving only a motion to reopen the Jefferson County case as a viable remedy. The commissioner concluded that Hines had not knowingly or intentionally disobeyed Rule 11, and that he had a good faith, non-frivolous basis for seeking to reopen the Jefferson County case.

### D. Proceedings before the Board of Governors and Review by this Court.

The Board of Governors did not take de novo review of the matter and instead accepted the trial commissioner's report as to all four files, as consolidated, as allowed under SCR 3.370(5). Specifically, the Board "decided by a vote of 13 to 6 that the decision of the Trial Commissioner, as to the findings of the violations and the degree of discipline imposed, was supported by substantial evidence and [was] not clearly erroneous."

Hines sought review of the recommendation from this Court under SCR 3.370(7), and filed his brief in the matter. The Office of Bar Counsel did not seek review but has filed a brief as allowed under SCR 3.370(7).

### II. Analysis

In his brief to this Court, which addresses all four disciplinary cases, Hines challenges that his conduct violated any rules, and claims that his conduct does not support a disciplinary sanction at all or, in the alternative, supports a lesser sanction. Because the trial Commissioner and Board recommended different sanctions for the three different fact patterns, each is addressed separately below.

### A. KBA Files 8969 and 12704

■ First, Hines claims that his conduct covered by Counts 1 and 2 did not violate the ethical rules, and asks that these counts be dismissed. He argues that he was acting at all times in the best interests of the corporation and that to equate his failures to communicate with Spencer and O'Brien with an ethical breach "is going too far."

The problem with this line of argument is that it suggests that the obligations to the best interests of a corporation under Rule 1.13 trump the requirement to respond to requests for information from the client as required by Rule 1.4. A corporation is a legal fiction and cannot act on its own; instead, it acts through its board of directors and officers and other agents. Here, the authorized agents were Spencer and O'Brien, both of whom requested that Hines explain his actions and provide certain information. Hines ignored these requests and continued to act on behalf of minority shareholders. Assuming that Hines worked in good faith, which the trial commissioner believed, then his work for the minority shareholders would have benefitted all of the shareholders, but it simply does not alleviate the duty to respond to the lawfully authorized agents of the corporation.

■ As to Counts 6 and 7, which addressed directly Hines's decision to side with the dissident heirs in his representation of the corporation, Hines argues that he acted properly if his behavior is viewed within the overall context of what has happening with the corporation in 2001 and 2002. He notes that some officers, board members, and shareholders were clearly dissatisfied with what was happening with the corporation and, as admitted by O'Brien, that the 2001 board and officer elections deviated from past practice. He argues that there were legitimate questions about who was lawfully authorized to act on behalf of the company, and that his

decision-making was difficult because of the volatile situation.

Again, however, the simple fact is that Hines was hired by the corporation, which acts through its board and officers. *Allied Ready Mix Co., Inc. ex rel. Mattingly v. Allen,* 994 S.W.2d 4, 8 (Ky.App.1998). If some of the board members and shareholders were dissatisfied, they had remedies available, namely, a shareholder derivative suit. But that is not what Hines did. Instead, he filed suit directly on behalf of the corporation. He even admitted that his suit should have been a shareholder derivative suit as the litigation progressed. The fact that *some* of the board and shareholders were dissatisfied did not justify Hines's decision to side with them and presume they were the lawful controllers of the company, and then to file suit directly on behalf of the corporation.

In fact, the decision whether to pursue litigation directly on behalf of the corporation is lodged solely with the board of directors. *See Allied Ready Mix Co., Inc.,* 994 S.W.2d at 8 ("Such decisions are part of the responsibility of a board of directors."). As noted above, where the board declines to pursue such litigation, and some shareholders nonetheless feel aggrieved, there is a remedy: the shareholder derivative suit under KRS 271B.7–400. Such suits are brought by the shareholders but are "brought in the right of a corporation." KRS 271B.7–400(2).

It has long been the law in such cases that an agent of the corporation, including the lawyer, "cannot serve two masters," and that "where interests conflict," the agent "will cleave to the one and forsake the other." *Louisville Bridge Co. v. Dodd,* 85 S.W. 683 (Ky.1905). While Rule 1.13 stated (and still states) that a lawyer is not automatically barred from representing officers or shareholders, a conflict can nonetheless arise. See Rule 1.13(e). It seems

that when the action is a derivative action brought by a minority shareholder alleging that the officers and directors are acting wrongly, then there is an inherent conflict, at least when the litigation commences.

That Hines was violating his duty of loyalty to the corporation, which was acting through its board, is shown by the fact that the board was largely unchanged in the supposedly illegal September 2000 election. Only one member of the board changed then. The term of a corporate director continues until his successor is elected. *See* KRS 271B.8–050(5). Thus, even if Hines is correct that the September 2000 elections were illegal and void, that only means that the board as constituted before the election continued. A majority of that board still favored terminating Hines and was opposed to the lawsuit filed in Perry County. Thus, the violation in Count 6 of Rule 1.13(a) was clearly shown.

Count 7 is more difficult. The rule Hines was charged with violating in this count requires a lawyer to make sure to communicate to various constituents of the corporation the identity of the client, i.e., the corporation. This rule is in place to prevent confusion so that the constituent— for example, an officer accused of improper self-dealing—does not incorrectly believe that the lawyer represents him instead of the corporation. The charge itself in this case alleged that Hines violated this rule when he became involved with the dissident faction and promoted its interests within the corporation. The trial commissioner believed a violation had occurred because Hines had effectively quit representing the corporation and had instead begun representing the minority interests without informing the corporation.

While this may have created a conflict of interest, such conduct does not

violate Rule 1.13(d). Bar Counsel had not shown that Hines held himself out to the corporation as its counsel while he actually had decided to represent the dissident heirs individually, or that he failed to explain to the dissident heirs that he represented the corporation and thus misled them. To a large extent, Count 7 (and to a lesser extent, Count 6) focus on a possible conflict of interest in Hines's continued involvement both with the corporation and with the dissident heirs. But, as Rule 1.13 itself noted, a lawyer may be able to represent both the corporation and some of its constituents at the same time and that questions of conflicts of interest were not resolved by that rule but instead were to be decided under Rule 1.7. *See* Rule 1.13(e).[44] No conflict of interest under Rule 1.7 was actually alleged in the count, or elsewhere in the charge. This Court concludes that the trial commissioner and Board of Governors were incorrect that Hines violated Rule 1.13(d).

■ As to the final two counts, which relate to Hines's actions with the corporation's files at the end of his participation in the declaration of rights action, he defends that he believed that the board of the corporation was not legally constituted after the fall 2000 meeting and "that the person [he] was representing in the Perry Circuit Court suit would be the legitimate governing authority of Cody Properties, Inc." This, he claims, justified transferring the files to and communicating with Bruce Atherton.

The problem, of course, is what is noted above: a majority of the pre–2000 board, which would have been the "legitimate"

board if the 2000 elections were void, still opposed Hines's actions. His claim that he thought he was representing persons who *would* be the legitimate board of the corporation is thus just bewildering in light of his own claims that the board that was actually voted on was improperly elected and thus void—surely, if an improper election voids a board and strips it of power, then the non-election of a hypothetical board would also have no authority. Hines's claim is no more than window-dressing. At the very least, it demonstrates that Hines was not really answering to any corporate master and was acting as a maverick in what he presumed was the best interest of the corporation. But Hines was never a principal in this action, though he acted as though he were, and was never more than an *agent* of the corporation.

We conclude that the proof showed that Hines acted improperly in turning over the files to and communicating with the attorney pursuing the derivative action.

Bar Counsel argues that the proof showed *all* the charges, and argues that this Court should find Hines guilty of all 15 counts, and not just the ones that the Board found. While there is evidence suggesting that the case against Hines was stronger in some respects than even the trial commissioner and Board of Governors found (e.g., as to Hines's failure to withdraw when terminated), this Court cannot do as Bar Counsel requests, if only because it has not sought review of those aspects of the Board's recommendation with which it disagrees.

---

44. That rule stated: "A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7. If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders." Rule 1.13(e).

While this Court's power over discipline is close to plenary, and this Court has frequently stated broadly that it undertakes a de novo review of disciplinary matters with the Board being an advisory body only, *see, e.g., Kentucky Bar Ass'n v. Berry*, 626 S.W.2d 632, 633 (Ky.1981), we see no reason to revisit the charges that the commissioner and Board concluded Hines was not guilty of.

"Review" of the Board's decision can be undertaken in three ways: (1) the lawyer asks for review; (2) the KBA, through Bar Counsel, asks for review; and (3) this Court independently asks for review.[45] *See* SCR 3.370(7)-(8).

Where this Court has asked for review, it is fairly clear that the entire case shall be reviewed. In such cases, unless the Court asks only that certain issues be addressed, both sides are on notice that the Court's plenary discipline power shall be exercised in the case, and that the Court will be considering all the charges, regardless whether the Board found the lawyer guilty of them or not. In such cases, both sides are on notice to address the entire case.

Where, as in this case, only one side has asked for review, it is less clear that the entire case should be before the Court where only the lawyer has asked for review. Certainly, Bar Counsel may seek review of a count of which the Board would find a lawyer not guilty. The rules allow such review, see SCR 3.370(7), and our cases have allowed it, *see, e.g., Kentucky Bar Ass'n v. Leadingham*, 269 S.W.3d 419, 420 (Ky.2008). And this Court may find a lawyer guilty of a count that the Board did not. *See id.* But in the majority of those cases, Bar Counsel specifically sought review of the matter. While there appear to be some outliers where this Court has disagreed with the Board's decision despite no formal review having been undertaken, *see, e.g., Kentucky Bar Ass'n v. Kessen*, 311 S.W.3d 249, 251 (Ky.2010), such decisions should not guide this Court's procedure.

The simple fact is that it would be unfair to allow the KBA or Bar Counsel to obtain review of counts the Board would find the lawyer not guilty of without formally requesting review under the rules. Without such a notice of review, the lawyer does not have formal notice that Bar Counsel is challenging the Board's recommendation and thus may not address the issue in his brief, which is filed first when he seeks review. Moreover, if the lawyer has sought review, as in this case, the lawyer is not allowed to reply to Bar Counsel's brief, *see* SCR 3.370(7), and thus would have no real opportunity to rebut Bar Counsel's claims.[46]

Additionally, if Bar Counsel can obtain review of not-guilty counts by simply raising the issue in its brief where the lawyer has asked for review, as it has done in this case, then we could see a substantial chilling effect on lawyers who wish to challenge the Board's recommendation. Such lawyers might be unwilling to ask for review if there is a danger that Bar Counsel will ask for review of the not-guilty counts on the back end of the process.

---

45. Though it is rare, sometimes both the lawyer and the KBA ask for review.

46. Hines has nonetheless anticipated some of the arguments of Bar Counsel in this respect. For example, as to the charge in KBA File 17216, both the trial commissioner and Board of Governors found Hines not guilty of all counts in the charge. Still, a section of Hines's brief is dedicated to explaining why he should not be found guilty of those counts by this Court. Presumably, this is part of the reason that Bar Counsel asked that he be found guilty on all counts in its brief.

■■ This Court concludes it is only fair that for Bar Counsel to obtain review of not-guilty counts, it must file a notice of review under SCR 3.370(7). If this Court has not independently decided to review the case under SCR 3.370(8) and only the lawyer has filed a notice of review, this Court will review only the aspects of the Board's recommendation that are adverse to the lawyer and for which the lawyer has sought review, and will adopt the other aspects of the recommendation of the Board.

Since this Court has not asked to review the matter independently, and Bar Counsel did not file a notice of review, this Court will not review the not-guilty counts.

More importantly, the other charges are adequate to account for Hines's misconduct in this case. Indeed, the charges (and facts underlying them) of which the Board of Governors found Hines not guilty are laid out in detail above only to give context to the rest of the charges, and to show that full consideration of this case was had.

Thus, this Court concludes that Hines is guilty of the counts found by the trial commissioner and Board of Governors, except Count 7 as discussed above.

### B. KBA File 15869

■ As to the two counts in this file, Hines simply argues that the trial court's decision that his characterization of the letter was wrong does not show an ethical violation. On this point, this Court must disagree.

Civil Rule 55.01 is clear: a lawyer must certify in a default-judgment motion that the defendant has not sent him any *papers*. "Papers" is a broader term than "pleading" or "sufficient answer." The choice of that word in the rule is important, because it takes responsibility (and power) away from the attorney to decide what is an adequate answer to a complaint so as to disallow a default judgment. If any papers have been served on the attorney, it is up to the judge to decide whether they are adequate. This approach is especially important when the defendant acts without counsel and thus may not be privy to all the procedural requirements. Hines was served with *papers* in the form of the letter from the defendant. It was his responsibility to inform the trial court of this fact so the court could evaluate whether the defendant intended to challenge the claim.

By filing his Rule 55.01 motion without the proper certification and by failing to notify the court of the letter, Hines violated the ethical rules as found by the trial commissioner and the Board of Governors.

### C. KBA File No. 17216

Bar Counsel did not seek review of this aspect of the Board of Governors' decision, and this Court has not independently sought to review it. While Bar Counsel's brief urges this Court to review the Board's decision at this point, this Court declines to do so. Instead, this Court adopts that portion of the Board's decision finding Hines not guilty under the counts of the charge in this file. The charge is therefore dismissed.

### D. The Appropriate Sanction

The remaining question, then, is the degree of appropriate discipline. Both the trial commissioner and Board thought that Hines's misconduct was serious enough to justify a 120–day suspension in KBA Files 8969 and 12704, and a public reprimand in KBA File 15869. Even though the four charges were joined and heard together, both the commissioner and Board addressed the sanction for the fact patterns separately.

This Court is of the opinion, however, that all the misconduct should be considered together, and that the sanction should reflect the totality of the circumstances of Hines's misconduct. On this point, the Court agrees with the Board and the trial commissioner that a suspension is appropriate. Hines committed multiple acts of misconduct spread out over three different bar complaints and charges. While two of the charges stemmed from the same general transaction—the dealings with the Cody heirs and their corporation—that misconduct persisted over several years, and included breaches of confidentiality. When the aggravating factors noted by the trial commissioner are considered with the mitigating factors, it is clear that a suspension is warranted, and that the 120 days recommended by both the Board and trial commissioner adequately reflect the misconduct in these cases. (The recommended public reprimand is unnecessary in light of the suspension.)

### III. Order

ACCORDINGLY, IT IS HEREBY ORDERED:

(1) Ronald E. Hines is found guilty of violations of the Rules of Professional Conduct as described above. He is found not guilty of the other alleged violations.

(2) Hines is suspended from the practice of law in the Commonwealth of Kentucky for 120 days.

(3) Under SCR 3.390, within ten days after the issuance of his order of suspension from the practice of law for more than sixty (60) days, Hines must notify, by letter duly placed with the United States Postal Service, all courts or other tribunals in which he has matters pending, and all clients of his inability to represent them and of the necessity and urgency of promptly retaining new counsel. Hines shall simultaneously provide a copy of all such letters of notification to the Office of Bar Counsel. Hines must immediately cancel any pending advertisements, to the extent possible, and must terminate any advertising activity for the duration of the term of suspension.

(4) In accordance with SCR 3.450, Hines is directed to pay all costs associated with these disciplinary proceedings against him, said sum being $15,805.16, for which execution may issue from this Court upon finality of this Opinion and Order.

All sitting. All concur.

ENTERED: June 20, 2013.

/s/ John D. Minton, Jr.